The first case on the calendar is Frey v. New York City et al. and Stephen Nigrelli. Ms. Bellantoni, I see you reserve three minutes for rebuttal, and you can begin whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. My name is Amy Bellantoni, and I represent the plaintiffs' appellants in this appeal, which seeks the reversal of the District Court's denial of my client's motion for a preliminary injunction as to various New York State regulations that affect and implicate firearms and the Second Amendment. The District Court's decision should be denied and reversed for three reasons, Your Honors. With respect to the courts holding that the appellants did not have standing to challenge the ban on open carry in New York State, I would submit that Antonyuk, in its conversation and discussion of Babbitt, provides support for William Sapay in having standing, Article III standing, to challenge the open carry ban. Second, with respect to Penal Law, Section 400.00, Subsection 6, which requires New York State licensees who already have a handgun license issued outside of New York City, requires them to submit to a permissive discretionary licensing scheme that is conducted by the New York City, New York Police Department, and obtain a special license in order to be able to carry lawfully in New York State. The District Court erred in holding that the government had satisfied their burden under Bruin. Let me ask you, you mentioned Antonyuk, and when I was reviewing a lot of the issues that you raised in terms of alleged errors by the District Court, it seems that Antonyuk answers several questions that you are still debating in this case, and I'm wondering whether you can help me on that. So first, I just want to make clear that your position is that the Second Amendment mandates open carrying of handguns in places in New York City that would include Times Square and the subways. Yes or no? So that's a dual question. Yeah, I know it implicates both things, but the bottom line is that is what you believe the Second Amendment mandates, and that the state and the city have no ability to regulate your client's open carry of firearms in Times Square and in the subway system. What I'm saying is that the Second Amendment plain text covers open and concealed carry. Heller defined the scope of public carry as including open and concealed carry. And the government's and my client's conduct is protected by that plain text, and the government has not proven. Including in Times Square and the subway, yes. Yes, Your Honor, because, yes. Okay, all right. Yes. So in Antonyuk, you said the text of the Second Amendment, Antonyuk made clear that this circuit should consider both the time of the founding and what the laws were, the regulations were at the time of the founding, and the time, at the time of Reconstruction. Antonyuk was very clear about that. Yes or no? Antonyuk was very clear about that, yes. And we have to follow that, right? I would submit that this Court's obligation is to the Supreme Court and not to necessarily that language. Well, the Supreme Court left that open. It considered both of those things in Bruin, but it did not say you are prohibited from considering the Reconstruction-era regulations, right? To an extent, that is correct. But Bruin's language is very clear, and it wasn't necessarily included in the Antonyuk decision where it says that. But to the extent you think that Antonyuk's wrong, we're still bound by it unless it's reversed by this panel, by this court en banc. I mean, don't you agree that's the controlling precedent in this circuit, that an individual panel cannot ignore a prior panel's holding? Yes, I would agree to that. All right, so at least as we're here today, we understand your argument that you don't agree with Antonyuk on that. But insofar as you're looking for relief from this panel, what can we do in light of our being controlled by Antonyuk? Well, I would submit, Your Honor, that the obligation is still on the government to prove that the justifications for the Times Square ban and the public transportation ban, it's still their obligation. All right, but in Antonyuk – first of all, I just want to point out Antonyuk also said from medieval England to the founding to beyond Reconstruction that there's a tradition of regulating firearms in often crowded public forums, that it's part of the immemorial custom of the nation. So it didn't just point to the Reconstruction, but the bottom line holding of Antonyuk was that the state had carried its burden as to urban parks by placing the regulation with a national tradition of regulating in often crowded public squares, including city parks. To the extent that that is this panel's obligation, then I really – If you can regulate a public park because it's an often crowded public square, what's the difference between that and regulating Times Square and the New York City subway system, which I would suggest to you is more crowded and more confined than an urban park? Well, I would submit with respect to Times Square that that area is arbitrarily drawn and it confines individuals in their Second Amendment rights to an extent that they're not necessarily aware of and considering where they're going. Which is more crowded, Central Park or Times Square on a Friday night? Probably Times Square. So if we're looking at the crowding issue, then yes, I submit that this panel has nowhere to go on that. With respect to the public – Are you disputing the area they've defined as Times Square? Because they are required, as I understand it, to define the area and post signs. Is there a challenge to how they have defined Times Square? There's no challenge to how they have. It's just how they came up with it. All right, so when you argue it's arbitrary, what do you mean by that? What's the basis for their even designating certain areas as the Times Square limitation? Judge Bianco just alluded to from Antoniuk. Antoniuk says, as he just discussed with you, that public parks are sufficiently crowded and confined areas, and I thought you agreed with him that Times Square would fit that description even more. Times Square is a very crowded area. That is correct. I'm not sure that every area that is contained within – So how do you distinguish the Times Square area from the Antoniuk Park? I can't distinguish it at this moment. They're all very crowded, and I do have a dispute as we discuss – Isn't the subway even worse? I mean, just going back to Bruin – forget about Antoniuk – Bruin says that recognize the founding era allowed the criminalizing of public carry to the fear or terror of a good citizen. That's what Bruin said, right? Yes. So my question to you with respect to subway is suppose you have a packed subway car where people are open carrying weapons. There's a dispute on the subway that the person on that subway – you're riding that subway. You can't leave. You're in a crowded subway. It's moving. You can't remove yourself from now what is a fight where people who are bearing arms in a subway car. Would that cause terror to the ordinary citizen? That's not my understanding of the – being afraid or bringing terror to the public. And bringing terror to the public is menacing and brandishing, and it's how your weapon is being used. But in a subway car, someone could grab someone else's – you're up against each other. Even if someone is – forget about open carrying – even has a holstered, concealed gun, someone could easily grab that gun on a subway. You're so close to that. Well, as many officers and other individuals in other open carry jurisdictions and even concealed carry individuals, there are retention holsters that do not allow for someone to grab your firearm out of your holster. So that would alleviate that issue. Are you denying that there are these potential issues in a subway car, right? When people are up against each other, inches away from each other. People are carrying weapons, carrying guns. Police officers are responding to a dispute in a subway car. We'd have to see people with guns, not knowing how to even respond to that. Isn't that a very volatile situation? The volatile situation and the most scary situation is the victims who are being terrorized by criminals who are going to carry no matter whether they have a license or don't have a license. And good, upstanding, law-abiding people should have the opportunity to defend themselves, which they've always had throughout time, as is their preexisting right from their creator. And so, yes, those people will be terrified by the criminals that they can't defend themselves against. What about the fact that historically railway cars were subject to regulation of that type? What's your response to that? Yes. So the railway cars and the analogy that... And the Albany streetcar. Yes. The railway cars, that example that was brought by the state, they didn't start out as governmental entities. So to the extent that there were regulations, or I wouldn't even call them regulations, I would say rules, proffered by a company that happened to own a railway system, that's not a historical analogy. And I'm sure the court has reviewed, or to some extent, the Yale Law Review article that was mentioned in the state's papers as well. But the earliest, and again, we're going back to now the timeframe of when these rules were instituted, but the earliest rule was imbued by the South Carolina Railroad, and that was 1825, which I would say is closer to the ratification. And guns were absolutely not banned by the South Carolina Railroad. And when we look at the other railroad companies that instituted rules, they're up further, much further away from the ratification, 1875, North Pennsylvania Railroad. Maybe I should try to take you a step back, because we can have a debate about that. But the bottom line is, I think, again, you can see that if we're following Antinuk, that if it applies at Times Square, it certainly would apply in a subway car as well, which is even worse for purposes of these types of considerations, right? Well, there was no governmental regulation of railroads until much, much later. This is a private company, so I would say there's an analogy. I think the biggest point that they make about the statewide open carry issue is that Bruin said that states could lawfully eliminate one kind of public carry, in that situation, concealed carry, so long as they left open the option to carry openly. That's Bruin. So I guess my question to you on that is, as long as you're providing the ability of your client to defend himself, why can't they regulate the manner, open versus concealed? Why is that inconsistent with our tradition? So, with respect to the discussion of the antebellum period, where there were certain statutes passed that banned concealed carry and continued to allow open carry, I would submit that that was the Bruin court's discussion of the state's proposed regulations to justify their regulations in the proper cause context. Heller makes very clear that both open and concealed are protected by the Second Amendment. Where does Heller say both open – Bruin says you can – the historical evidence indicates that you can regulate the manner of public carry. Yes. That's subject to reasonable regulation, right? Well, I would submit that the manner, not the modality of carry, the manner of public carry is regulating brandishing and affray and terrorizing and shooting in the air and doing things that are not protected by the Second Amendment. That would be the manner of carry. The modality of carry would be – I understand that that's the core issue of what that means, but on the fundamental issue of the right to defend yourself under the Second Amendment, which has obviously been recognized, what's the difference? How is that right affected if you're told you have to conceal your weapon as opposed to carry it openly? How does that affect your ability to defend yourself? Oh, in many ways, Your Honor. There are many different reasons as to why someone would carry concealed as opposed to open carry, depending on what you're wearing for the day, depending on where you're going, depending on the circumstances. So you're suggesting that if you had to conceal your weapon, you'd be unable to carry it? There's a situation where you'd be unable to carry it? Is that what you're suggesting? I'm asking you why a person can't fully defend themselves with a concealed carry weapon as opposed to an open carry. And respectfully, I would say that they don't have to justify whether they would like to open carry or conceal carry because both modalities of carry are protected by the plain text as laid out in Heller. Let's say I disagree with you on that. Can you just explain to me why their ability to defend themselves is impacted one versus the other? It's very situational. It's a personal choice, Your Honor. When you're open carry, you're not trying to get— There's a tradition of prohibiting concealed carry, the thought being that it was sneaky, that it didn't give the public notice that you were carrying. So there has been a tradition of allowing the government to limit the way you could carry firearms. Do you not agree with that? I don't know that I would necessarily say a tradition, but there certainly are statutes out there from the 1800s and cases. Okay. So now the question is whether the reverse can be true, whether the government can say you can carry, but it has to be concealed. The logic, I assume, being that that way you don't cause public fear when people see you are armed. I mean, they can come up with whatever argument they want, but why is it that that is not at least a viable question here? I mean, your burden here is to show us that there's a clear and substantial likelihood that you're going to succeed on the merits, and I'm not sure I understand how we could find that given that they do allow a form of carry. It's got to be concealed, not open. How can we say there's a clear likelihood you're going to succeed on the merits that you have to be allowed to open carry? Because there isn't one case that the state or the city have shown that supports the idea that there is a tradition of regulating or banning open carry. Open carry has been around since the cavemen. No, and I understand that there are 40 some odd states that allow it. I understand that. But I'm suggesting to you that the principle we take is that the state has some ability to regulate whether the carry, the means by which you carry, as long as you can protect yourself. And that's the point we're asking, is how is your ability to protect yourself impeded by requiring the carry to be concealed rather than open? Because the state hasn't proven that there has been a historical tradition of regulating or banning or limiting open carry. We should ask how and why the regulations burden a law-abiding citizen's right to armed self-defense. That's what Bruin says we should focus on. How and why the regulation burdens a law-abiding citizen's right to armed self-defense. So I'm asking you, how does it burden a law-abiding citizen's right to armed self-defense to say they have to conceal their weapon as opposed to carry it openly? Bruin tells us to ask that question. I'm asking you that question, and you're telling me that it doesn't matter. No, with regard to how and why, I believe that that discussion was in the portion of the decision that spoke to nuance, leading to nuance. It talks about historical analogs. It's talking about historical analogs. And the historical analog here is that there has been regulation of the manner of the carry. And the question is how and why in modern times does that affect the law-abiding citizen's right to self-defense, where sensibilities may have changed from being terrorized by someone who's concealing versus the sensibilities now being terrorized by someone who's openly carrying. That's the way I analyze that language. We don't need an analog here, Your Honor, because the issue of open carry is not something that needs to be analogized to something that's a modern-day phenomenon. Forty-five out of the 50 states have lawful open carry. Police officers open carry. Security officers open carry. No one sees a plainclothes officer walking down the street or in a store with their holster on and freaks out because they feel terrorized. People who are law-abiding open carrying do not present a threat to anyone. And they have not proven, the government, that there is any burden historically on the right to open carry. Thank you. May I ask a question, too, about the subway before counsel sits down? I think I heard you say in response to a question about the history of railway limitations that those were private companies. Is that right? Yes. All right. Now, I understand that, but we do take away from it that from the start, when they were private companies, there were restrictions. We also have a body of law that says that the government can control the carrying of firearms on its own property. And why isn't that the circumstance with the subway? This is basically a government-provided means of transportation. This is government property. Today, it's government property, yes. Right. And there is a tradition of the government being able to limit carrying of firearms on its property, courthouses, government buildings, et cetera. Why doesn't that tilt this in favor of the city and the state? Because it's still the government's burden to show that specifically that the government has a tradition of regulating and banning firearms. I'm not sure I understand you. Isn't it your burden in looking for an injunction to show that there's a clear likelihood you're going to succeed on the merits? Oh, yes, Your Honor. Absolutely. But within that burden, the burden. Yes. What's the clear likelihood you're going to succeed on the merits given that this is government property, it's a confined area? I think that there's also a question, which I know you dispute, about whether it's frequented by a vulnerable population. But anybody who's been on the New York City subway between 3 and 5 o'clock will tell you that it's got a large school-age population. Why are we leaving children to be victims in gun-free zones? That just makes no sense to me. I'm suggesting to you that there is a tradition of limiting firearm possession in areas where there are vulnerable populations. And one of those recognized vulnerable populations is school-age children. I think the vulnerable population is a blanket that's been recently created by the anti-Second Amendment faction. When we talk about schools and schools banning firearms, it actually began with a university in Virginia. And that was in the mid-to-late 1800s, I believe. And that was banning the students who were armed and creating a ruckus from possessing firearms on their campus, not other people. It's not that you haven't raised serious questions here, but that you haven't demonstrated a sufficient likelihood of success for us to grant you the injunctive relief you want so that the day after tomorrow, anyone can go armed on the New York City subways and in Times Square. That this still needs further record development and a trial. May I make two points before I respectfully run out? First, this lawsuit is not asking that anyone be able to go open carry and carry in Times Square. Possession of a firearm without a license has always been a felony. All right, I understand. The CCIA- Licensed individuals, okay. The CCIA now made law-abiding individuals who now have to jump through numerous hoops to even get a license. Now they've made them felons. My question remains, I'll amend it for licensed holders. How have you shown the likelihood of success? I've shown a likelihood of success because within that bubble is a shifting burden. And I've shown and I've proven that the conduct my clients are looking to engage in or are seeking to engage in is protected by the Second Amendment. And that burden shifts to the government, which they've not let. If we affirm the denial of the injunction, what type of fact-finding are you going to be asking for in the district court? Are you going to be asking for any type of evidentiary hearing or fact-finding or what's your view on that? No, I anticipate this is a legal issue that should go to summary judgment and move forward into the courts. Nothing else is going to happen. It's all the same issues. If you went in and asked for a motion for a permanent injunction and it was denied, we'd be right back here, right? Yes, Your Honor, which is why I would ask that this court issue a permanent injunction because the merits are here already. There's nothing further to develop. You think you have all the evidence you need to win this case. You don't want to depose the city or its agents or the state or its agents on any of the issues here. Is that what you're telling us? That's correct. Okay. Thank you. All right, thank you. I think we reversed the order here. We're going to hear from the state first. Mr. Levitz. Thank you, Your Honors. Philip Levitz for the state appellee. This court should affirm because history and tradition amply support each of the provisions of New York firearm law that plaintiffs challenge, and the remaining preliminary injunction factors weigh strongly against an injunction. Plaintiffs challenge New York's sensitive place regulations governing Times Square and MTA subways and trains, and New York's longstanding regulations prohibiting open carry of firearms and requiring New York City-specific licenses to carry in the city. First, I'd like to start- Your adversary said that what's going to happen if it goes back, if it goes back to the district court, is it will immediately go to summary judgment. Nothing else, no discovery, no further fact-finding. Do you concede that that's likely or possible? It is a possibility, but there's also certainly a potential for more expert discovery to be done. I mean, the record- But if they made a motion for summary judgment based upon a request for a permanent injunction, you wouldn't oppose it saying, no, no, we want to do more, right? No, I mean, the record here is clearly insufficient for the plaintiffs to prevail, so- Let me ask you about the open carry issue because, you know, I cited-Bruin obviously said that the founding year recognized the ability to criminalize public carry to the fear or terror of the good citizen. So my question to you is, aren't there some limitations on that? Yeah, this is a statewide open carry ban, and even assuming either because it's a sensitive place or even an urban environment that you could ban open carry for that type of reason, isn't it too broad to ban it for the whole state? It seems to be suffering from some of the same issues that Antonuk recognized with urban parks versus rural parks. So in other words, upstate New York, if someone open carries in upstate New York, is that really going to bring fear or terror to the citizens of upstate New York in a rural area? The first thing I'd say to that is Antonuk provides useful guidance here. I mean, this is a facial challenge, so it has to prevail. It has to be true in all cases that the statute is unconstitutional for the facial challenge to succeed. So even if there were some question about, you know, some obscure location in North Country, that's not what we have here. I don't think it's an obscure location. We're talking about a large portion of upstate New York, not an urban environment. And insofar as Antonuk was drawing the same distinction, what Antonuk said is the challenge to the parks. I understand it's a facial challenge, and maybe therefore don't have to address that, but how do you defend that? Yeah, I mean, I think we defend that because history supports it, and history supports it because— I'm sorry, a little slower. I'm sorry, history supports it. And what the Second Amendment history makes clear is, as Your Honors were getting at, I think, in your questioning earlier, the method of carrying has always been subject to regulation as long as there's an ability to carry. And as Your Honors, again, were getting at, simply limiting the ability to carry openly does not in any way restrict the ability to carry and the right to carry. And plaintiffs could point to no answer to that because, again, you can carry concealed, and that gives you the same ability to protect yourself that any other form of carrying would. And the history is clear that— Is that clear? I mean, where would we draw that conclusion from, that there's no difference in the ability to protect yourself, whether it's open carry or concealed carry? The answer to that may be that that's correct, but what basis is there for us to conclude that? I mean, I don't think Your Honors need to conclude that because, again, the question here is what does the— Well, I mean, first there's a question as to what does the Second Amendment even protect. And what Bruin said is basically, as long as you can carry, period, the method of carry can be regulated. Well, but they say that in conjunction with cases that are tolerating limits on concealed carry. I mean, even now, more than 40 states allow open carry. So the tradition seems to be in favor of open carry. And I know you've tried to say this is a facial challenge, but we do have an overbreadth concern here. I think, first of all, to what the history actually is here, I mean, the reason that a lot of the 19th century cases focused on concealed carry is clearly because there was a different understanding of modes of carrying at that time. That was viewed as the sinister way to carry now. More than 40 states allow open carry. What they preclude is concealed carry. And several states do something different. They tend to be states that have more urban areas, including Florida, Illinois, D.C. Well, for example, California, I think, as you know, has a law that limits it only with, I think, over 200,000 people, right? Well, California has a law that generally restricts open carry and has a limited exception for certain areas. Again, there's no plaintiff in this— You're looking for counties with a population over 200,000, right? If your county doesn't have a population over 200,000 in California, you can open carry. Why doesn't that make sense for New York? It may be another way that New York could have regulated. It chose not to, to make the simpler rule that is consistent with all the historical rules that had a general rule applying to everybody. Again, if there was a facial challenge here from a plaintiff who was actually, you know, facing that issue, fine. But we're not facing that. We're facing plaintiffs who don't make that claim. They say they want to open carry, like you said, in Times Square and in the subway and wherever else. And that's what's clearly not permitted. And if I can turn to the sensitive places as well, I want to make sure that I get to touch on that as well. Well, I think, as Your Honors, we're getting at, Antoniuk really basically decided that issue for you because the court made entirely clear— There's one big distinction. Ms. Benettoni didn't raise it, but effectively her client would be unable to use the subway system. He wants to protect himself. He's carrying jewelry. And if you say you can't have the gun in a subway, you can't have the gun in Times Square, unlike saying you can't have it in a park, he's going to be unable to defend himself when he's carrying his jewelry, isn't he? If he's going to use the public transportation system and go down to the Diamond District, he's got a big problem, right? If he chooses to use the public transportation system, that may be true. Maybe that's his only mechanism for traveling. Maybe he doesn't have a car. There is no plaintiff in this case who's made that sort of claim. Why is that so far-fetched? The only way he travels to and from New York City is using public transportation. Right. It's not necessarily far-fetched, but it's speculative in this case. You have no plaintiff in this case who's actually made that claim. I thought he said he wants to travel in the subway system and he wants to protect himself because he carries jewelry. Isn't that what we have here, or am I missing something? I think you're conflating two plaintiffs. There's one plaintiff who says, I'd like to travel on Metro North and I'd like to travel on the subway to go to Junior's to buy cheesecake or to Williamsburg. That plaintiff, Fry, does not say at any time in any declaration that he needs to travel by train. So the other plaintiff, Sappy, does not claim to even want to ride on public transportation at all. He says he wants to drive and he wants to drive through Times Square in order to get to his job. His job is not in Times Square. He never claims that. He could drive around Times Square, as the district court rightly noted. So, again, there's nobody who's claiming they need to go through these places in this case. You know, in any event, again, we need to go back to what the test actually is here, which is, does history support this? And as Your Honors, we're getting at, you know, Antonyuk already recognized this rich historical tradition of regulating particularly crowded places. These are quintessentially crowded places, as crowded as you possibly can get. They're also places, as Your Honors, we're getting at with a lot of vulnerable people, children, older people, disabled people, sometimes intoxicated people. Again, what the Antonyuk court made completely clear is that there's a very rich historical tradition of regulating guns where those sorts of people are present to protect public safety. The regulations here of trains and of Times Square are serving exactly the same purpose that this court already recognized. And under the test of ruin, as applied in Antonyuk, they must be upheld here, too. There's simply no difference that anybody has pointed to. Your time is up. Okay. Thank you, Your Honors. We'll hear from the city instructor. May it please the court, Alina Jerker on behalf of the city. I want to address a few points that we were already talking about and try not to repeat too much of what the colleague of the state just said. But fundamentally, Antonyuk resolves much of this case as to the sensitive places, I think, as we've already discussed, quintessentially crowded public spaces. That's sort of the end of the discussion. There is a longstanding historical tradition. Wait, wait. I mean, the fact that a space is crowded is not enough by itself to put in limitations. The Supreme Court has said that. And Antonyuk was always careful to identify something beyond crowdedness. So what, I mean, my concern here is Antonyuk relied very heavily on the fares and markets analogy as the historical precedent. But if you read those cases, going back to the English cases, it was when the carry was in a way that created fear or affront. This is the knights coming all armed and everything and coming through the fairgrounds. It wasn't a general prohibition on the carrying of weapons. So there's that concern. But all this suggests a little bit of caution in what we assume about crowded areas. I think there's a little bit more to it than that. And I think in the Bruin, the Supreme Court recognized that there are sensitive locations where firearms can be prohibited. And that includes public spaces that are government-owned like buildings and like perhaps trains. They're all enclosed. Well, there's something sensitive about them beyond they're just being crowded. Absolutely. And so when I say quintessentially crowded public confined spaces, acute dense spaces, I'm not talking about any city street because Bruin made clear that we couldn't designate and the state couldn't designate every street in New York City as crowded. That's not what the CCIA is doing. It's identified specific places that are particularly sensitive. And Times Square is one of those places, as I think counsel has conceded, that's basically indistinguishable from urban parks as an area of intense crowding. I mean, millions of people pass through as a tourist hub, Times Square, the theater district. There are, people are packed side to side, touching each other, walking through that area. At some hours. Yeah, and that is sufficient for designating it as a sensitive location. And Antonyuk supports that. Is there a map created of where in New York City you can carry a gun and where you can't and what the percentages are? I don't have a map of that, no. But I do know that- How is an average person supposed to know and have notice of it? I think that the law is fairly clear about what areas are designated. So the areas that are designated are the urban parks or Times Square, the subways. I mean, I haven't picked a map. I'd say probably the vast majority of the city- Let me ask you before your time winds up about the New York special permit. Yes, happily. How does the special permit requirements differ from the state requirements? Because on looking at it, it wasn't immediately apparent to me that you're asking for anything different from the state. So, I absolutely will answer your question. I will back it up by just first saying that I'm not sure that the difference is really what registers under Bruin. The question under Bruin is whether there's a historical tradition. And the sort of policy, is this the right policy type of questions are no longer really part of the equation. Well, you see, if your requirements are the same as the state and the person already has a state license, my concern is that this is a meaningless hurdle. So that's why I'm asking, what more is it that New York City is concerned about that has it have its own specialized license requirement? So there's two things. First of all, it is a common feature of New York state law that recognizes that New York City is a uniquely dense, populated area with a lot of historical expertise and municipal home rule, legislative authority. And this is not in any way really a Second Amendment feature, but more a feature of New York state law, which recognizes New York City and gives it the special authority. And what specifics to your question the NYPD is looking at, as the expert in New York City, is a couple of things that are different than the state application. One is that people who are applying with New York City are supposed to affirm knowledge of local circumstances and applicable laws. That means someone coming from outside of the city has an opportunity to understand exactly your question. Where can I carry and where can't I carry? And I personally don't have that map, but I'll tell you that the NYPD can have a conversation with them to ensure that they know where they can carry. New York City also requires a safeguard, which means a person is designated in the event that you become incapacitated and you have your firearm, as the person who would take custody of your firearm. And more than that, New York City ensures that the licensee from upstate has a valid, current license that was properly issued and based on updated facts. Which means their license, which may be approaching expiring, hasn't been reviewed for a significant time, and things could have happened in the interim period. But that would mean that they're not licensed anymore, right? No. Which they can't carry in New York if they don't have a valid license. They can't carry anywhere in the state. No, so some things are automatic disqualifiers, so a felony arrest. And other things are factors which will become assessed by the licensing official in deciding a person's, let's say, dangerousness, which is how Antonia explained the essential temperament to carry a firearm safely. So someone who's had some incidents in time between when their license was issued may no longer be able to get their license renewed. But they will have a valid license until that point. And that person would come to New York City and NYPD would say, well, I actually need to assess whether or not your license is based on updated facts. So those two considerations together, I mean, there's- Is this in the record? Or, see, this is my concern about whether this needs record development on this point. The plaintiff's counsel says they don't want a wit of discovery, but I didn't see this in the record. So the applications that are all publicly available from- I mean, you can see what the state requires and what the city requires. But, no, this was a preliminary injunction. And the plaintiff's counsel said that they have no further factual development. But what the nature of a preliminary injunction is, much of the question, I think, will be about the historical tradition. And the government is- So you're saying there will be additional work to be done when this moves, if and when this moves, from a preliminary injunction to permanent injunction? I wouldn't rule it out, but I would say that the main question that Bruin puts to the courts about a regulation is whether or not it has a longstanding historical tradition. And these are great questions, but fundamentally, I think we win easily. I mean, not only the plaintiffs don't have a likelihood of success, but on this record, we'd easily win because there is a longstanding historical tradition going back to the founding of licensing at the local level. By the 1800s, Elmira, Binghamton- In fact, it was more burdensome 100 years ago. A person traveling through New York- I just want to ask you a question, and maybe your answer is similar to the state. But why should we be concerned- I know I conflated two plaintiffs, but let's just- Let me do that. So somebody who can only ride the subway, they don't have enough money for a car. They're completely relying on public transportation. They carry jewelry all the time. They're concerned when they use public transportation, they could get robbed, and they want to arm themselves. Why should we be concerned that that versus- Even though this is- Even if we assume this is generally a sensitive place, that there's no exceptions for someone like that to be able to defend themselves day to day in what they do every single day, which seems to be a legitimate concern by someone in that situation? I think I have maybe four answers, and I'll try to go through them quickly. The first is, as I think the state immediately responded, this is a facial challenge. The personal circumstances of an individual who, as applied to them, thinks that the burdens are personally different and more acute can bring an as-applied challenge. And perhaps we can discuss that there. But here the question is whether this rule is unconstitutional in every application, and it's not. Moreover, I think after Bruin, these sort of policy considerations about whether this is a good rule are really off the table. The question is whether it's consistent with the historical tradition. And to the extent that this question can be sort of shoehorned into the burden portion of the analysis and the analogs, the drastic technological differences places us in a situation where we look at these analogs, we think about the comparable burdens, we say, oh, is this burden comparable? And then on that point, so that's number three, is our burden is comparable because it's really the same burden as any other sensitive place, which is you have to plan ahead. It may be inconvenient. If you are a schoolteacher, a prohibition at schools, which Bruin recognizes has a longstanding tradition and is basically, I mean, we're no longer discussing that. Bruin said you can designate schools as a sensitive location. There might be a person for whom that is a particularly hard burden, but that's not how we think about burdens in this context, right? We think about whether the burden is, you can't carry your gun there and you have to plan ahead. Not, is the burden different for one person versus another, does the law, because that's not how legislative action really just requires a question of- But it is not planning ahead here. The person works in New York City. They want to carry the jewelry or the money in the New York City subway as part of their job. And there's no planning, there's no, you should plan, there's no planning. That person can't defend themselves every day, even though they're carrying valuable items in the public transportation system, because New York City won't let them. So if a person has to go to a school as a part of their day every single day, they also can't carry because they have a location that they intend to go that's sensitive, or if they plan to pass through Times Square. It breaks the idea of sensitive places to say that an individual who cannot avoid that location, suddenly the whole enterprise is broken, right? I mean, the point is they can plan ahead. They can take a bike- I'm not suggesting the whole enterprise is broken, but there could be exceptions for those types of situations, right? But as to the very first argument, this is a facial challenge. So we're not able to, we don't have a kind of record that would let us even talk about that. I worry too much, right? I mean, take a bicycle. That's my answer. You're saying it's a facial challenge, but if we were to rule for you, just as we ruled for the plaintiffs in Antoinette, are you saying when the person shows up who does carry the jewelry on the subway, that you won't try and argue that this case controls and that we shouldn't hear that other individual at all? I mean, you don't want us to hear anything about public parks or other locations that were dealt with in Antoinette. You don't want us to discuss those in this case. I guess the question is, if a person is carrying a firearm on the subway tomorrow because they have valuables, they would be breaking the law. But if we're saying, is there a conceivable plaintiff in some hypothetical world who could bring a different lawsuit in which they actually have a factual record they want to develop and they say- You're saying they'd need to bring an as-applied challenge. And then we could talk about it. But I can't hypothesize about what potential options they have or whether the law is unconstitutional as applied to that theoretical person. Here we have a facial challenge suggesting that it is unconstitutional in all every application to prohibit firearms on New York City subways and at Times Square. Or to require people to concealed carry rather than open carrying in New York City and the rest of New York City. Concealed carry versus open carry, even though you can defend yourself equally, what about the deterrent value of open carrying? That someone is not going to try to attack you if you're open carrying as opposed to concealed carrying. Why is that in our consideration? Or somebody will decide to target you for theft. My friend was pickpocketed. I'm sorry, some people might- I'm sorry, will target you. My friend was pickpocketed a couple of weeks ago. Counsel, you're speaking too fast. I'm sorry, Your Honor. You're not understanding my point that someone who wants to open carry says, look, I understand I can defend myself if I have it concealed and holstered. But I don't want to have to use my gun. If I open carry, I'll less likely be a target. What's your response to that person? I'm sorry, my response was a little glib. What I was saying is that people may have a personal preference about how they would rather carry. But what Bruin recognizes the Second Amendment core protects, the text, is the right to carry for purposes of self-defense. And the fact that a person who feels that they would, I would rather be a large human, personally, I would feel safer that way. But that's not what the Second Amendment protects. It protects the right to carry for armed self-defense. And armed self-defense means that you can use your weapon to protect yourself. All right. Thank you. Ms. Galantoni, you have three minutes for rebuttal. Thank you, Your Honor. It sounds like this as-applied challenge that theoretically may come up at some point in the future is just another proper cause. So if there's a blanket ban on Times Square and public transportation, and then someone has an as-applied challenge to bring, doesn't that necessarily mean that they're going to be coming in to say, well, I have real proper cause, and as applied to me, it shouldn't apply. There's no historical tradition here. And it leaves people with these sensitive areas, especially public transportation. Not only is the sensitive area public transportation, but it's from their front door to the transportation, on the transportation, off the transportation, to wherever they're going during their day, back onto the transportation, and then back home. They are disarmed for the entire day, for all of the people. And plainly, this probably disparately impacts, and I don't have clients that are there. Mr. Sape does not take the subway, so that's a clarification. But Mr. Fry does. But for people that have to go to work and get on the buses, those are typically lower socioeconomic disadvantaged people. And just like, you know, the South passing laws against, you know, freedmen possessing firearms, these are also disparately impacting the lower socioeconomic classes that are now disarmed for the entire day. And when they get home at night, they have to walk home disarmed and in fear of being robbed. And I believe my footnote at my reply brief, footnote 25, makes the point that as I was writing my reply brief, there was an article in the paper where an individual was robbed at gunpoint in Times Square. These public safety justifications were rejected in Heller, more specifically rejected in McDonald, and then blatantly rejected in Bruin. Public safety cannot be ever a justification for infringing on rights that are protected by the plain text of the Second Amendment. With regard to statements about the New York City needing to reassess, just so for the court's edification, and this is not justification with a historical tradition, but upstate, outside of New York City, when there is an arrest, typically the New York State police or the arresting agency will run the background. They will learn that the person has a pistol license. They will notify the licensing officer. The licensing officer will have, you know, orders for that license to be suspended based on the arrest itself. The license will be turned in and all handguns will be turned in. So if there's some theory that someone upstate may have gotten into an arrest or, you know, some foul situation and are going to be carrying in the city, that would have been taken place and taken care of. These are all facts that could be developed on further discovery, but you say you don't want to. And they don't matter. I just want to clear the record up for misinformation that's coming from the city. They don't matter because they haven't justified it with a historical tradition. You're saying it's not relevant. It's not relevant. They haven't met their burden. Where's the tradition of requiring two licenses in the same state? And even further to that, which I'm not attacking the entire licensing scheme, where's the tradition of requiring a license? Licenses were not in the founding era. Licenses didn't come around until the early 1911 was our license and further on into 1920 and 1930, other than the permission that was required for the blacks from their slave owners to be able to carry a long gun. But formal licensing did not exist at the founding. And I believe that our founding fathers would have deemed that repugnant to the Constitution to, you know, go to Britain and ask for permission to be able to be armed. I don't think we'd be standing here as America if that was the case. Let me ask you, even this is somewhat ambiguous in the sense that the district court's findings on the tradition are rather briefly stated. So it looked to me like there's a lot more that could be put before the district court. No? Both in terms of what there is and, from your perspective, what there isn't. I have no burden as a plaintiff other than to show that the conduct is protected by the plain text of the Second Amendment. You have a burden if you want injunctive relief. Yes, but as I stated before, respectfully, Your Honor, that's my burden because the requirements at this stage are the same as the requirements at trial, right? So my requirement as a plaintiff is to show that my client's conduct is protected by the plain text. And then the burden then shifts entirely to the state and to the city, to the government. And if they can't meet their burden, I win. My clients win. And we will win, whether it's, you know, eventually we will win because there is no tradition. Your intention is to go immediately for summary judgment, right? Yes. All right, thank you. Thank you. We're reserved decision. Thank you all for your arguments today. Have a good day.